THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: August 8, 2012                    Mailed: June 14, 2013

## UNITED STATES PATENT AND TRADEMARK OFFICE
### Trademark Trial and Appeal Board

————

*Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape*

*v.*

*Pasquier DesVignes*

————

Opposition No. 91179408

to application Serial No. 78971147

————

Mark Lebow of Young & Thompson for Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape.

John A. Clifford of Merchant & Gould P.C. for Pasquier DesVignes.

————

Before Zervas, Mermelstein and Wolfson, Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

Pasquier DesVignes, by change of name from Etablissements Quinson[1], ("applicant") filed an application to register the standard character mark CHEMIN DES PAPES for "wines, sparkling wines, distilled spirits and liquors" in International Class 33.[2]  The application contains the following translation statement:  The English translation of "Chemin des Papes" is "way of the popes."

———

[1] Assignment recorded on April 25, 2011, at Reel/Frame 5428/0048.
[2] Filed September 11, 2006, on the basis of applicant's assertion of a bona fide intent to use the mark in commerce under Trademark Act § 1(b).

Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape, a French collective association located in Chateauneuf-du-Pape, France, ("opposer") opposes the registration of applicant's mark on the grounds of priority of use and likelihood of confusion, alleging that applicant's mark so resembles opposer's previously used and registered mark, shown below:



for "wine that originates from Chateauneuf-du-Pape," that confusion as to source under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), is likely among relevant purchasers.[3]    Opposer further alleges that it owns rights to the unregistered mark CHATEAUNEUF-DU-PAPE CONTRÔLÉ for wine.[4]   Opposer's pleaded registration for the design mark includes the following translation statement:   "The English translation of 'CHATEAUNEUF-DU-PAPE CONTRÔLÉ' is 'vineyard of the Pope Control.'"   In its brief, opposer indicates that a more accurate translation of "Chateauneuf-du-Pape" would be "new castle of the pope" or "new chateau of the pope."[5]

---

[3] Registration No. 2097158 registered on September 16, 1997, pursuant to Sections 1(b) and 44(e) of the Trademark Act.  Based on French registration No. 96/605136 (which expired on January 8, 2006).  Sections 8 and 15 affidavits accepted; renewed.

[4] Notice of opposition, paragraphs 1-5.

[5] *Brief,* p. 9.

Applicant has denied the salient allegations in the notice of opposition with respect to opposer's claim of a likelihood of confusion under Section 2(d).[6] However, in the notice, opposer further claims that applicant lacks a bona fide intent to use its mark on "distilled spirits" [paragraph 38] or on "liquors" [paragraph 39]. With respect to this claim, applicant has admitted the assertions in paragraphs 38 and 39 in its answer to the notice of opposition and in response to opposer's requests for admission. During the oral hearing, counsel agreed that, should applicant's application otherwise be in condition for issuance, applicant would accept judgment on this issue and deletion of "distilled spirits" and "liquors" from the application.

## I. The Record

Pursuant to Trademark Rule 2.122(b), the record includes applicant's application file and the pleadings. In addition, the parties introduced the following testimony and evidence.

*A. Opposer's Testimony and Evidence*

1. Testimony of Alain Junguenet, president of Wines of France, Inc., importers and distributors of wine from France, with accompanying exhibits;

2. Testimony upon written questions of Norbert Olszak, professor of law at the Paris University 1, of Pantheon Sorbonne, with accompanying exhibits, testifying as an expert witness with knowledge of the French AOC system as it relates to wine;

---

[6] Applicant further asserted various "affirmative defenses" that are not in the nature of true affirmative defenses, but rather merely serve to expand upon and amplify its denial of opposer's likelihood of confusion claim. While paragraph 21 states affirmative defenses of laches, estoppel and acquiescence, none of these was pursued at trial or argued in applicant's brief. Accordingly, each affirmative defense is considered waived. *Baroness Small Estates, Inc.,* 104 USPQ2d 1224, 1225 fn. 2 (TTAB 2012); *Research in Motion Ltd. v. Defining Presence Mktg. Group, Inc.,* 102 USPQ2d 1187, 1190 (TTAB 2012).

3. Testimony upon written questions of Bruno Le Roy de Boiseaumarie, owner of the winery Chateau Fortier, a member of opposer's board of directors and Chairman of the board of directors of the Federation des Syndicat de producteurs de Chateauneuf-du-Pape, with accompanying exhibits;

4. Opposer's First Notice of Reliance, dated October 15, 2010, comprised of portions of three books and two publications on wine; and two articles about songs that use "Chateauneuf-du-Pape" in the lyrics;

5. Opposer's Second Notice of Reliance, dated October 19, 2010, comprised of applicant's responses to opposer's first set of document production requests;[7] and

6. Opposer's Third Notice of Reliance, dated November 5, 2010, comprised of a.) applicant's answers to opposer's first and second sets of requests for admission and applicant's responses to opposer's first set of interrogatories; b.) a copy of opposer's pleaded Reg. No. 2097158 as well as copies of the file history for the application; c.) copies from the Office's TARR and assignment databases showing title and status of Reg. No. 2097158; and d.) a copy of a page from the website www.snooth.com, purporting to show an instance of actual confusion.

### B. Applicant's Testimony and Evidence

1. Testimony of Edward McCarthy, a "wine writer, journalist, book author, [and] wine book author" for "about 35, 37 years,"[8] with accompanying exhibits, testifying as an expert witness in the field of wine;

2. Testimony of Joseph Helfrich, president and CEO of Les Grands Chais de France, which acquired Etablissements Quinson in 1991, with accompanying exhibits;

3. Applicant's Notice of Reliance, dated February 17, 2011, comprised of a.) excerpts from five books, a magazine, and several wine-related websites; b.) excerpts from Collins-Robert French/English English/French dictionary, third edition; c.) two decisions from

---

[7] This evidence has not been considered, as documents produced in response to a request for production of documents may not be introduced under notice of reliance. Trademark Rule 2.120(j)(3)(ii).

[8] McCarthy dep., p. 10.

foreign courts; d.) opposer's responses to applicant's requests for admission and interrogatories; e.) copies of USPTO records of third-party registrations; f.) copies of 106 applications for label/bottle approval for various wine names filed with the Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau; and g.) copies of website excerpts regarding papal regalia and insignia;[9]

4. Applicant's Notice of Reliance, dated February 18, 2011, comprised of the French version of the two court decisions previously submitted with applicant's first notice of reliance.

## C. *Evidence of "89" Series Records Inadmissible*

Applicant contends in its brief that the use of papal symbols on wine labels is common practice, and that they "are protected by the papacy and belong to no single wine maker…." In support of this contention, application references "Trademark Application Serial Nos. 89/000832 et. al." and provides a listing of four records—allegedly from the USPTO's database: Serial Nos. 89/000832, 000831, 000830, and 000828. Applicant does not provide a copy of any of these "89-series" records.

Opposer objects to applicant's reliance upon the 89-series records, or any one of them, because none was submitted during applicant's testimony period. Applicant did not seek to introduce copies of these records as evidence, but merely listed them in its brief. Accordingly, we will not consider the records themselves as evidence, and, inasmuch as the Board does not take judicial notice of records residing in the Office, the references are of no value. *In re Jonathan Drew,* 97 USPQ2d 1640, 1644 fn. 11 (TTAB 2011); *see also, Edom Laboratories, Inc. v. Glenn*

---

[9] The notice of reliance indicates that copies of the file histories for Reg. No. 2097158 and Serial No. 78971147 are included; however, they were not among the materials filed under the notice of reliance. Opposer included the file history of its registration with its third notice of reliance. The file history of the involved application is already of record and need not have been submitted. Trademark Rule 2.122(b).

*Lichter,* 102 USPQ2d 1546, 1550 (TTAB 2012). On the other hand, applicant properly introduced evidence during its testimony period describing various types of papal regalia and insignia that is used by the Pope, which we have considered.

## II. The French AOC System

In order to understand the context in which this trademark dispute arises, it is useful to gain an understanding of the differences in the naming conventions for wine between the United States and European nations, in particular, those of France.

In the United States, wine produced domestically may include a regional certification of origin, but in order to identify the grapes that make up the wine, most American wines carry varietal names. "A varietal wine is a wine that is named after either the principal or the sole grape variety that makes up the wine…. Unlike American wines, most European wines are named for the *region* where their grapes grow rather than for the grape variety itself."[10] European winemakers name their wines after places because, after having had "centuries to figure out which grape grows best where, the name of a place where grapes are grown in Europe automatically connotes the grape (or grapes) used to make the wine of that place."[11]

This is particularly true with respect to French wine. In 1935, the French government created a system recognizing the unique "terroirs," or "climate, soil, and local tradition,"[12] of three hundred specifically defined territories within the five major wine-growing regions in France: Bordeaux, Burgundy, the Rhone, the Loire

---

[10] McCarthy dep., exhibit 26, *Wine for Dummies* (4th ed. 2006), pp. 50-51.

[11] Id., at p. 52.

[12] Id., at p. 53.

and Alsace.[13]  By decree, the "Institut National Des Appellations D'Origine," or INAO, was established to control the quality of the wine produced in each of these defined regions and territories.  As explained by the Court of Appeals for the Federal Circuit:

> INAO is an organization established and existing under the laws of France whose membership consists, in part, of wine growers, wine merchants and representatives from various wine-producing regions and communities within France. One of INAO's functions is to act on behalf of French wine producers and merchants to maintain a system of identifying French wines, brandies, and spirits through the use of "appellations d'origine" (appellations of origin) and to protect against or suppress misuses of those appellations on a worldwide basis.

*Institut Nat'l Des Appellations D'Origine v. Vintners Int'l Co. Inc.*, 958 F.2d 1574, 22 USPQ2d 1190, 1192 (Fed. Cir. 1992).[14]

Today, the INAO controls the methods of making wine produced from grapes grown in each specific territory by controlling the name, known as the "appellation d'origine controlee," or AOC, by which the wine produced in each territory may be identified.[15]  Included in this system are the registered and defined territories of "Chateauneuf-du-Pape" and "Cotes du Rhone."  Both are AOCs in southern France that are located within the Rhone Valley, a large non-AOC region within which Chateauneuf-du-Pape, Cotes du Rhone (and other AOCs) are situated.  Wine that is blended from several AOCs in the Rhone Valley may bear a more general

---

[13] McCarthy dep., exhibit 28.

[14] As discussed more fully *infra,* the evidence of record herein reflects the Court's explanation regarding the functions of the INAO.

[15] "Appellation d'origine contrôlée" may be translated as "regulated place name."  *See, e.g.,* Olszak dep., p. 6, McCarthy dep., exhibit 26.

geographic designation of origin, but under French law, only wine grown and vinified in compliance with the geographic and other criteria of that specific AOC (e.g., Chateauneuf-du-Pape; Cotes du Rhone) may legally be labeled as such.[16] Within the Chateauneuf-du-Pape AOC, there are "over a hundred" winemakers; within the Cotes du Rhone AOC they number "into the thousands."[17]

The labeling follows a strict convention in France: the word "appellation" precedes the name of the AOC territory and the word "controlee" follows.[18] In accordance with this system, applicant, members of opposer's syndicate, as well as members of other syndicates, unaffiliated winegrowers, and "negociants"[19] are permitted to sell wine that is lawfully labeled "Appellation Chateauneuf-du-Pape Controlee." Like any other AOC Chateauneuf-du-Pape producers, opposer's members sell wine lawfully labeled "Appellation Chateauneuf-du-Pape Controlee" under each of their individual brand names. Opposer's members may also place opposer's registered design mark on their bottles. Opposer's mark usually appears embossed on the glass above the producer's label.

### III. The Parties

Opposer is an association, or "syndicate," of winegrowers formed in 1923.[20] The Chateauneuf-du-Pape AOC includes at least one other syndicate, as well as a

---

[16] Boiseaumarie dep., p. 19. "The use of the phrase 'Chateauneuf-du-Pape' on the label is permitted only if in the bottle there is a Chateauneuf-du-Pape wine. And that's excluding any other kind of wine."
[17] McCarthy dep., p. 90.
[18] Olszak dep., p. 10.
[19] A negociant is a wine merchant who does not grow grapes but rather buys wine and bottles it for export and for sale within France.
[20] Boiseaumarie dep., p. 7.

number of independent producers who are not members of a syndicate.[21]  All such producers make wine from grapes grown only in the Chateauneuf-du-Pape territory of France.  Regardless of membership in a syndicate, the designation "Chateauneuf-du-Pape" may be used by any wine producer or "negociant" whose wine has been fermented from grapes of permitted varieties grown in the defined Chateauneuf-du-Pape AOC territory.  While any winegrower producing wine from Chateauneuf-du-Pape may label its wine with the AOC "Chateauneuf-du-Pape" to indicate its geographic origin and compliance with the INAO regulations, only opposer's members may use opposer's registered combination word and design mark for their Chateauneuf-du-Pape wine.

Applicant is an independent negociant which sells wine, including wine lawfully labeled "Appellation Cotes du Rhone Controlee."  This latter wine is sold by applicant under the brand name and opposed mark CHEMIN DES PAPES.  Like Chateauneuf-du-Pape, Cotes du Rhone is an AOC within the Rhone valley, and geographically overlaps[22] (but is larger than) the Chateauneuf-du-Pape AOC.  Applicant also sells a Chateauneuf-du-Pape wine, but under the brand name

---

[21] Id., at p. 35.

[22] AOCs are not always geographically exclusive.  It is possible to produce more than one AOC wine in the same area when designated AOC territories overlap.  Nor must all wine produced within an AOC bear the AOC designation, because it is possible for a winery to produce both AOC-designated wine and wine not so designated.  *See e.g.,* McCarthy dep. p. 78:  "Q.  Is it possible for a single winery to produce wine in one region within a single AOC, but some of the wine uses the name of the AOC on the label and other wine does not use the name of the AOC?  A.  Yes, this is an example right here."

CALVET.[23] Applicant's Chateauneuf-du-Pape wine does not now bear the mark CHEMIN DES PAPES.

Applicant bottles wine from grapes grown in many regions in France, including the Rhone Valley. Applicant's witness Joseph Helfrich, president and CEO of applicant's parent corporation, stated that applicant intends to use its mark CHEMIN DES PAPES on four AOC wines from the Rhone Valley: Cotes du Rhone, Cotes du Rhone Villages, Crozes-Hermitage and Chateauneuf-du-Pape.[24] The evidence of record shows the mark CHEMIN DES PAPES currently is used only with two of these four AOC indicators, Cotes du Rhone and Cotes du Rhone Villages.[25]

## IV. Standing

Opposer's third notice of reliance included a plain paper copy of its registration, along with information from USPTO records showing status and title in opposer. Accordingly, opposer has demonstrated that it is the owner of its pleaded registration, that the registration is valid and subsisting, and therefore that opposer has standing to bring this action. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

---

[23] Helfrich dep., p. 57; exhibit 47.

[24] Helfrich dep., p. 14.

[25] Despite the fact that applicant does not now use its CHEMIN DES PAPES brand on Chateauneuf-du-Pape wines, and apparently has no intention to do so, the goods in the subject application comprise "wines," without limitation. We therefore must construe the application to include all types of wine, without limitation. *Paula Payne Prods. Co. v. Johnson Publ'g Co., Inc.*, 473 F.2d 901, 177 USPQ 76, 77-78 (CCPA 1973).

## V.    Opposer's Claim of Rights to "Chateauneuf-du-Pape"

We begin our analysis of opposer's rights by addressing its claim to common law rights in the designation "Chateauneuf-du-Pape" (without any design elements).  To establish rights to CHATEAUNEUF-DU-PAPE as a trademark vis-à-vis applicant, opposer must prove that it is the rightful owner of a distinctive mark, that it has priority of use, and that there is a likelihood of confusion. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981).  As for priority, the record evidence shows that applicant first sold wine in the United States under the mark CHEMIN DES PAPES in 2002.[26]  There is no direct testimony or evidence establishing the date of first use in the United States of CHATEAUNEUF-DU-PAPE by opposer, but Mr. Junguenet, owner of the New Jersey business, "Wines of France, Inc.," testified that he has imported CHATEAUNEUF-DU-PAPE wine since 1984.[27]  Although the record does not clarify whether the 1984 importation included wines bearing opposer's mark, applicant has not contested opposer's claim that it is the earlier user of the mark CHATEAUNEUF-DU-PAPE in the United States.  We find that opposer has priority of use of the mark CHATEAUNEUF-DU-PAPE for purposes of this proceeding.

However, for the reasons discussed more fully, *infra,* we find that opposer is not the rightful owner of the mark CHATEAUNEUF-DU-PAPE.  Although opposer

---

[26] "Sales Summary," submitted in response to interrogatory Nos. 10 and 18 of opposer's first set of interrogatories to applicant, attached to opposer's 10/19/10 notice of reliance. *See* TBMP § 704.10 ("Documents provided as all or part of an answer to an interrogatory may be made of record, as an interrogatory answer, by notice of reliance….").

[27] Junguenet dep., pp. 5-6.

and two other syndicates joined forces in 1963 to create the "Federation des Syndicate de Producteurs de Chateauneuf-du-Pape" in order to "promote and defend the mark and to defend the Chateauneuf-du-Pape name,"[28] the evidence of record shows that other organizations have likewise been formed to prevent unauthorized use of the Chateauneuf-du-Pape AOC, specifically, the INAO. Indeed, the evidence reflects that INAO controls the use of the AOC "Chateauneuf-du-Pape" designation as a certification of geographic origin and quality and type of grapes grown, cultivated, fermented, and bottled in the AOC-delimited Chateauneuf-du-Pape territory. Opposer's expert witness, Norbert Olszak, in response to applicant's interrogatories on written questions, specifically "Question number 8, please explain generally the French AOC system as it relates to wine?" stated as follows:

> A. So the French AOC system protects the wine denomination of quality under the control of the government through a specialized public body which is called the INAO which is the national institute of origin and quality. In the French system AOC is recognized by government decree and its use is controlled by government and administration services.
>
> Q. Question number nine, is Chateauneuf-du-Pape a controlled term under the AOC system?
>
> A. Yes, it is.
>
> Q. Question number ten, does Chateauneuf-du-Pape have geographical significance?
>
> A. Yes, it has.
>
> Q. Question number 11, please explain the geographical meaning of the term Chateauneuf-du-Pape as it relates to the AOC system?

---

[28] Boiseaumarie dep., p. 8.

> A.   Chateauneuf-du-Pape is the name of a wine whose qualities and features come from a specific origin and a [sic] specific production methods which are recognized in a government decree.[29]

In addition, there are other bodies that apparently have been organized to defend the rights of winegrowers and negociants, who bottle and sell wines using grapes grown exclusively in the Chateauneuf-du-Pape territory, to label their wine with the AOC.  Mr. Boiseaumarie, a member of opposer's board of directors and chair of the Federation des Syndicat de Producteurs de Chateauneuf-du-Pape, was asked during his deposition "how is the AOC system enforced in France?"   His answers present additional names of organizations that are involved in the control of the AOC Chateauneuf-du-Pape:

> A.   So the AOC system is controlled by the French administration.   And namely a body called DGCCRS, that's the fraud body.[30]   And this administration makes sure that the AOC system is enforced.
>
> There is another administration which is called the INAO which also controls and if both find something wrong with the AOC enforcement of the AOC system they can go to court and sue the people who are infringing this system.
>
> [Opposer] is also making sure that the wines that are presented are Chateauneuf-du-Pape wines.
>
> The INPI also signed a convention with the INAO, the INPI makes sure or monitors the brands that are infringing the AOC system.   The INPI is the French patent office or trademark office.[31]

---

[29] Id., p. 6.
[30] Mr. Boiseaumarie did not explain what the abbreviation stands for.
[31] Boiseaumarie dep., p 20.

As can be seen, Mr. Boiseaumarie, mentions that opposer "makes sure" that Chateauneuf-du-Pape wines "are presented" as such. He goes on to elaborate opposer's position, while also naming other, third-party, enforcement entities:[32]

> Q. Question number 11, who has the statutory role of defending the AOC Chateauneuf-du-Pape?
>
> A. So it's the Federation of Syndicat[33] which has been asked by [opposer] to defend the Chateauneuf-du-Pape AOC. And since 2008, ODG[34] is also serving as such.
>
> Q. Does [opposer] have any role regarding the defense of the AOC Chateauneuf-du-Pape? If so, please elaborate?
>
> A. Yes, it has a role. It is in all legal actions a Claimant.[35]

Other testimony contradicts Mr. Boiseaumarie's assertion that opposer is a claimant in all legal actions (as he asserts above) concerning the AOC Chateauneuf-du-Pape. Specifically, Mr. Boiseaumarie, when asked about two such cases, stated

---

[32] We note that Mr. Boiseaumarie and Mr. Olszak's depositions were taken upon written questions because these witnesses reside outside of the United States. See Trademark Rule 2.124. This cumbersome procedure produces less than satisfactory results, inasmuch as all questions must be prepared in advance, including any follow-up questions to anticipated responses to the questions. If a response is not as anticipated, it is not possible to pose any different follow-up questions to clarify such an answer. Accordingly, the overall production of useful information is limited.

[33] Mr. Boiseaumarie refers earlier in his deposition to the "Federation des Syndicat de producteurs de Chateauneuf-du-Pape" as "a professional organization composed of several Syndicat." Boiseaumarie dep., p. 7. He indicates that three member syndicates comprise the Federation, including opposer, and that the role of the Federation is to "defend[] its owners and wine growers of Chateauneuf-du-Pape. It also defends the mark and the name Chateauneuf-du-Pape, and also promotes the mark." Id, at pp. 7-8.

[34] According to Mr. Boiseaumarie, the ODG ("Organismes de Defense et de Gestion") was created in 2008 to "defend the Chateauneuf-du-Pape AOC." Boiseaumarie dep., p. 9. Mr. Olszak described the ODG as follows: "A. So the ODG is a new body. It stands for organization of defense and management. So it's a new body which was created in 2006 during the reform of the AOC system in France. The ODG represents the AOC in order for it to obtain recognition. And also the ODG defends the AOC on top of the official services such as the INAO." At pp. 18-19.

[35] Boiseaumarie dep., p. 27.

that in one case, "the Federation was not the plaintiff but the SIDVAOC, the other organization [was]."[36]  The acronym "SIDVAOC" appears to stand for the "Syndicat intercommunal de defense viticole de l'appellation d'origine Chateauneuf-du-Pape."[37]  *See also*, Boiseaumarie dep., p. 15, where Mr. Boiseaumarie also identifies SIDVAOC as "another professional organization … which takes care of the defense of the name Chateauneuf-du-Pape."  And while it is stated under a slightly different name, it appears Mr. Boiseaumarie is asked about SIDVAOC by way of the question:  "what is the Syndicat Intercommunal de Defence de l'Appellation d'Origine Chateauneuf-du-Pape and what is its role with respect to such appellation?"  Mr. Boiseaumarie's answer is:  "So as the name states it's a professional organization which defends the Chateauneuf-du-Pape AOC and that's its role to defend the Chateauneuf-du-Pape AOC."[38]

Significantly, Mr. Boiseaumarie and Mr. Olszak's responses reveal the array of interests centered on protecting the AOC Chateauneuf-du-Pape from unauthorized use.  Based on this and all the evidence of record, we find that the designation "Chateauneuf-du-Pape" is a geographical indication that has special status as an AOC, or regulated appellation of origin, in France.  Nonetheless, this record does not support opposer's claim that in the United States, CHATEAUNEUF-DU-PAPE is a common law regional certification mark for wine,

---

[36] Id., p. 28.
[37] Olszak dep., p. 18.
[38] Id., p. 29.

or that opposer is the owner of such mark.[39] *See, e.g., Institut National Des Appellations d'Origine v. Brown-Forman Corp.,* 47 USPQ2d 1875 (TTAB 1998) (COGNAC is valid common law regional certification mark for brandy). Because opposer has not shown that it owns the mark in the United States, opposer does not have the right to control other's use of "Chateauneuf-du-Pape" in connection with wine sold in the United States.[40]

In view thereof, opposer's claim that registration of applicant's mark is likely to cause confusion with opposer's common law rights in the mark CHATEAUNEUF-DU-PAPE is dismissed. We will now decide the merit of opposer's claim that applicant's mark is likely to cause confusion with opposer's registered combination word and design mark.

VI.  Section 2(d) Claim with respect to Opposer's Registered Trademark

To prevail on a claim under Trademark Act Section 2(d), an opposer must establish, by a preponderance of the evidence, that it has priority and that there is a likelihood of confusion between its mark and the applicant's mark. *See, e.g., Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002) ("[t]he burden of proof rests with the opposer … to produce sufficient evidence

---

[39] To the contrary, as we have noted above, it appears that INAO is the certifying entity for all AOCs, and thus controls their use by wine growers. We note, however, that we have not been asked to determine whether or not "Chateauneuf-du-Pape" is, in fact, a geographic certification mark owned by INAO in the United States. We further note that the record does not contain any evidence that opposer has entered into an agreement with any of these other entities as an owner of the AOC Chateauneuf-du-Pape.

[40] The INAO decree in question was included as exhibit 13 to the testimony deposition upon written questions of Mr. Olszak. The decree itself is in French. Mr. Olszak describes it as follows: "This decree defines the production condition of the Chateauneuf-du-Pape wines. You can find provisions concerning the vines, the size of the cultivation methods, the vinification, the minimum degree of alcohol and other criteria." At p. 13.

to support the ultimate conclusion of [priority of use] and likelihood of confusion"); *Hoover Co. v. Royal Appliance Mfg. Co.,* 283 F.3d 1357, 57 USPQ2d 1720, 1722 (Fed. Cir. 2001); and *Kraft Group LLC v. William A. Harpole,* 90 USPQ2d 1837, 1841 (TTAB 2009) ("To prevail on a Section 2(d) ground of opposition, the movant must prove priority and likelihood of confusion.").

A.     *Priority*

Here, because opposer owns a valid and subsisting registration for the mark CHATEAUNEUF-DU-PAPE CONTRÔLÉ and design for "wine," Section 2(d) priority is not an issue as to the mark and goods covered in the registration. *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).[41]

B.     *Likelihood of Confusion with Opposer's Registered Mark*

We base our determination under Section 2(d) on an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*du Pont*").

---

[41] On December 15, 2010, applicant filed a petition to cancel opposer's pleaded registration, which petition was dismissed with prejudice by the Board as an untimely compulsory counterclaim.  Can. No. 92053402, dismissed December 17, 2010.  The essential claim upon which applicant based its petition to cancel was that opposer's mark was erroneously registered as a trademark instead of as a certification mark, and is therefore subject to cancellation because opposer (as registrant) did not comply with the rules for filing certification marks under Trademark Rule 2.45.  Specifically, applicant alleged that opposer did not include in its application a statement that it exercises legitimate control over the use of the certification mark by others, and does not engage itself in the production of goods to which the certification mark is applied.  We make no determination herein as to whether or not the registered mark was improperly filed as a trademark rather than a certification (or collective) mark, as that question has been removed from this case by the dismissal of applicant's petition to cancel opposer's registration.  On the other hand, the fact that the registration is not subject to attack herein does not preclude us from deciding, as we have done, that opposer is not the owner of exclusive common-law rights in the term Chateauneuf-du-Pape.

*See also, In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). Our primary reviewing court has held that only those *du Pont* factors shown to be material or relevant in the particular case and which have evidence submitted thereon need be considered. *See Majestic Distilling*, 65 USPQ2d at 1204 ("Not all of the DuPont factors may be relevant or of equal weight in a given case, and 'any one of the factors may control a particular case.'") (citation omitted). However, in any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

We discuss each of the *du Pont* factors as to which the parties have submitted argument or evidence. To the extent that any other *du Pont* factors for which no evidence or argument was presented may nonetheless be applicable, we treat them as neutral.

1. *Fame of the Registered Mark*

Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp.*, 63 USPQ2d at 1305; *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350,

22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Because of the extreme deference accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting fame to clearly prove it. *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594, 1597 (TTAB 2009); *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

There is ample record evidence to establish that the term "Chateauneuf-du-Pape" is well-known in the United States as a type of wine that comes from a specific territory in France.[42] However, the issue is not whether "Chateauneuf-du-Pape" is well-known as a type of wine from a specific territory in France, but whether the particular coat of arms and stylization of the AOC designation Chateauneuf-du-Pape that comprise opposer's mark is famous:



.

We find that on this record, opposer has failed to meet its burden that its registered mark is famous. While the fame of a mark may be proven by indirect evidence such as high levels of sales, advertising, or length of use, *Bose Corp. v. QSC Audio*

---

[42] *See, e.g., The Beverage Testing Institute's Buying Guide to Inexpensive Wines*, edited by Charles Laverick, Sterling Publishing Company, Inc. (1999) ("The most famous wine of the southern Rhone is Chateauneuf-du-Pape"); Junguenet dep., p. 21; Boiseaumarie dep., p. 25; McCarthy dep., p. 110: "Would you agree that Chateauneuf-du-Pape is a famous wine? A. Yes, it is."

*Products*, 63 USPQ2d at 1305, opposer's evidence in this case does not establish the fame of its registered mark. The total production of Chateauneuf-du-Pape wine from the specified AOC of Chateauneuf-du-Pape has been shown to be 13 million bottles per year,[43] twenty percent of which is exported to the United States.[44] At an average of $45 per bottle, this represents about $121 million in sales per year.[45] However, the record evidence for production and sales of Chateauneuf-du-Pape wine in the United States is not exclusively for opposer's branded product, but includes the production and sale of many different brands of Chateauneuf-du-Pape wine; not all of them are associated with opposer's syndicate. While these figures may be significant for total sales of Chateauneuf-du-Pape wine, they have not been broken down to show how many bottles of Chateauneuf-du-Pape wine bear opposer's registered mark, or what percentage of total revenue comes from sales of such wines. In addition, the record evidence of third-party media attention that has been given to Chateauneuf-du-Pape wines is not specific to opposer's wines or those of its members, but references Chateauneuf-du-Pape wine, with little or no specific reference to opposer or use of opposer's registered trademark. For example, opposer's evidence shows that in 2001 "a major wine tasting event which has been organized by the Wine Spectator in the U.S., in New York,"[46] featured Chateauneuf-du-Pape wines from winegrowers that were not identified as being affiliated with opposer, and whose bottles would not feature opposer's registered mark. Although

[43] Junguenet dep., p. 39.
[44] Boiseaumarie dep., pp. 23-24.
[45] Opposer's brief, p. 29.
[46] Boiseaumarie dep., p. 14; exhibit 10.

opposer promotes its member's wines by estate tours and wine tastings in stores, restaurants and at events held throughout the United States,[47] a close look at the materials used to promote these events shows that they do not specifically or exclusively promote only opposer's member's wines. It is unclear to what extent opposer's efforts benefitted its own (or its members') wine as opposed to Chateauneuf-du-Pape wines in general. The invitation to a "Chateauneuf-du-Pape Winetasting Experience" at the 4th Avignon/New York film festival features a trademark other than opposer's registered mark (comprising a different coat of arms including a depiction of the Pope's tiara and St. Peter's keys together with a different stylization of the words "Chateauneuf-du-Pape)";[48] the record does not reflect whether this is another producer's mark or another syndicate's mark. Whatever may be the case for "Chateauneuf-du-Pape" in general, the record is simply insufficient to show that opposer's *registered* mark is famous. References that tend to show that "Chateauneuf-du-Pape" has garnered some renown as an AOC (or as a type of wine) do not prove that opposer's registered mark is famous.

2. *Similarity of the Marks*

In determining the similarity of applicant's and opposer's registered marks, we have focused on the similarity or dissimilarity of "the marks in their entireties as to appearance, sound, connotation, and commercial impression." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567).

---

[47] Junguenet dep., pp. 17-18; exhibit 9.
[48] Boiseaumarie dep., p. 13; exhibit 8.

Although our analysis cannot be predicated on dissecting the marks into their various components, different features may be analyzed to determine whether the marks are similar. *Price Candy Co. v. Gold Medal Candy Corp.,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955); *Cunningham,* 55 USPQ2d at 1845. In fact, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re Nat'l Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984); and *In re J.M. Originals Inc.,* 6 USPQ2d 1393, 1394 (TTAB 1987).

Here, applicant's mark is comprised entirely of the literal element CHEMIN DES PAPES. Opposer's registered mark contains the words "Chateauneuf-du-Pape Controle" and the design elements of a papal tiara and St. Peter's keys:



Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), sets forth several presumptions derived from ownership of a federally registered trademark, namely, that the mark is valid, that it is owned by the registrant, and that the registrant has the exclusive right to use the mark in commerce in connection with the goods or services listed in the registration, subject to any limitations stated in the certificate.

22

Thus, even though we find that the designation "Chateauneuf-du-Pape" is not owned by opposer, it is a part of opposer's registered mark and we have not disregarded it. As we have acknowledged, "marks must be viewed 'in their entireties,' and it is improper to dissect a mark when engaging in this analysis, including when a mark contains both words and a design." *In re Viterra Inc.,* 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012).

On the other hand, "[m]ore dominant features will, of course, weigh heavier in the overall impression of a mark." *In re Electrolyte Laboratories, Inc.,* 929 F.2d 645, 647, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990). Although words typically dominate over designs, "[t]here is no general rule as to whether letters or design will dominate in composite marks." Id. Here, we find that opposer's registered mark is dominated by the design elements in the mark. "Chateauneuf-du-Pape" is simply a weak indicator of source — at least with respect to opposer — because it does not identify opposer (or its members) as the single source for wine bearing that designation; opposer is only one of a number of entities which may use the term on a label to designate wines originating from a particular geographic place.

The registered mark is just as likely to be remembered by the design of papal insignia, which is unique to opposer, as by the words "Chateauneuf-du-Pape" (or Chateauneuf-du-Pape Contrôlé), which are not under opposer's control and are associated not only with members of opposer's syndicate, but numerous other winemakers, and syndicates. Moreover, the design is prominently displayed in the center of the mark, is proportionally larger than the wording, and is very

23

distinctive, inasmuch as it uses highly symbolic and well-known regalia relating to the Pope and the Catholic church. The circular shape in which the words have been displayed further emphasize the overall circular design composition of the mark.

The connotations engendered by each mark are also quite different. Applicant's mark CHEMIN DES PAPES means, in French, "the way (or road) of the popes." The literal elements in opposer's mark CHATEAUNEUF-DU-PAPE translate to "new castle of the pope."[49] These terms are visually and aurally different, and they evoke very different impressions despite the shared element "pape(s)." And to those who are familiar with the history of Rhone Valley wine and the road built by or to commemorate the pope, there is an even further attenuation as applicant's mark suggests this historical road, while opposer's mark does not.[50] Moreover, the words "Chateauneuf-du-Pape" in opposer's mark are followed by the word "contrôlé," signifying wine that has been made according to the INAO standards of production. Applicant's mark CHEMIN DES PAPES would not be perceived as a controlled appellation by wine consumers with a working knowledge of the French AOC system, as it is not followed by the word "controlee."

On the other hand, purchasers may not know French, in which case they will not translate either mark. In that case, there is even less chance of confusion. The first word of each mark, CHEMIN and CHATEAUNEUF, bear no meaningful

---

[49] We recognize that opposer's mark includes the term "contrôlé," but as this term has been disclaimed, and is used to designate that opposer's wine meets the INAO standards, it has very little, if any, source-identifying significance. To the extent it does, however, its presence simply further attenuates any similarity between the marks.

[50] *See* McCarthy dep., p. 17; exhibit 1, a map of the "papal route" that is "currently used as a tourist route. [I]t goes on various roads throughout the Rhone Valley as places where the pope used to stay. And it's quite popular over there now." Id.

resemblance despite the fact that each starts with the letters "ch." Finally, as we have noted *supra,* the only shared element in the marks is the word "pape" (or its plural form "papes"), which, as will be seen, is not exclusive to either party.

For the above reasons, we find applicant's and opposer's registered marks, in their entireties, are not similar. This *du Pont* factor favors applicant.

3. *Use of the word "PAPE" by Third Parties*

The sixth *du Pont* factor requires us to consider evidence pertaining to the number and nature of similar marks in use on similar goods. "The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different such marks on the bases of minute distinctions." *Palm Bay*, 73 USPQ2d at 1694.

Applicant has provided evidence of use of marks containing "pape," "papes," or "pope" for wine (other than as part of the term "Chateauneuf-du-pape") in support of its position that the word "pape" is weak. Mr. McCarthy testified to the sale in the United States of several wines that are labeled with marks including the term "pape" or "papes." One of the oldest third-party uses of a mark that includes the word "pape" is the brand name "Chateau Pape Clement," for a Bordeaux wine.[51] This brand was first used in the 13th century. Mr. McCarthy testified that it has been on sale in the United States for "much longer" than thirty years[52] and that he

---

[51] McCarthy dep., p. 30; exhibits 9, 24. The appellation "Bordeaux" describes a specific AOC region in France. See also Boiseaumarie dep., p. 43; Helfrich dep., p. 35.
[52] McCarthy dep., p. 62. "Q. And how long has [the mark Chateau Pape Clement] been used in the United States, to your knowledge? A. As long as I can remember in my lifetime. Q.

"owns some."[53] Mr. McCarthy also testified to sales of "Vieux Papes" red and white table wine sold as "vin de France"[54] wine at Whole Foods grocery stores, and he identified an advertisement inviting prospective consumers to a wine-tasting of VIEUX PAPES wine on February 25, 2011, at a Whole Foods in Honolulu, Hawaii.[55]

Mr. McCarthy also identified six other wine labels that were presented to him of wines with the word "pape" (or "papes") in their name, as follows:

1.) "Cuvee du Pape Jean-Paul II," for a wine from Burgundy;[56]

2.) "Cellier du Pape St. Leon IX," for several varieties of wine from Alsace;[57]

3.) "Cuvee du Pape," for a Champagne;[58]

4.) "Hypocras du Palais des Papes," for aperitif wine from Cotes du Rhone;[59]

5.) "Chateau Le Pape" for a Bordeaux;[60] and

6.) "Vignerons de L'Enclave des Papes" for a Cotes du Rhone.[61]

None of these wines is from the Chateauneuf-du-Pape territory and none of the producers is a member of opposer's syndicate.[62] Although it is unclear from Mr.

---

So 30 years would be a fair statement? A. Oh, longer, much longer." Mr. McCarthy's deposition was taken on May 3, 2011.

[53] Id.

[54] The designation "vin de France" is a form of "vin de pays," which has been defined as follows. "Vin de Pays is a designation reserved for wines that come from a particular area but do not meet the requirements for the more specific appellation designation (AOC)." Thomas, Tara Q., *Wine Basics, The Complete Idiot's Guide,* 2d ed., 2008, p. 191; submitted under applicant's 2/17/11 notice of reliance.

[55] Id., pp. 49-52; exhibits 18-20.

[56] McCarthy dep., p. 46; exhibit 17.

[57] Id. "Vin d'Alsace is the name of the appellation controlee." Mr. McCarthy identified three different grape varieties, an Edelzwicker, a Riesling and a Tokay Pinot Gris.

[58] Id., p. 47.

[59] Id.

[60] Id., p. 48.

[61] Id.

[62] Id., p. 49.

McCarthy's testimony whether these wines are for sale in the United States, we have considered them as somewhat probative of whether wines containing "pape" (or "papes") in their brand names are familiar to consumers in the United States. We note that three of them include, in English: "Product [or Produce] of France" (a required element)[63] on the label, and the record suggests all of them are available via on-line websites.

In addition to the above evidence, applicant has submitted numerous "Applications for and Certification/Exemption of Label/Bottle Approval" that have been approved by the U.S. Alcohol Tobacco Tax and Trade Bureau (TTB) for imported wines from France. Mr. McCarthy identified several wines from these records whose names include the term "pape" or "papes," for example: L'ESPRIT DE PAPE, from the Cotes-du-Roussillon region of France;[64] CAVES DES PAPES wine from the AOC Cotes du Rhone;[65] PROMENADE DES PAPES wine from the AOC Cotes du Rhone Villages[66] and, as noted above, VIEUX PAPES, which he describes as a "simple table wine."[67] Mr. McCarthy further identified some domestic wines. For example, a wine made in the central coast of California called "El Pape" is produced by a group called Hug Cellars.[68] PAPE STAR wine also comes from the central coast of California.[69] Mr. McCarthy also identified a wine imported from

---

[63] Thomas, Tara Q., *Wine Basics, The Complete Idiot's Guide,* 2d ed., 2008, p. 22; submitted under applicant's 2/17/11 notice of reliance.
[64] Id., p. 22. This region is identified as an AOC in exhibit 28.
[65] Id., p. 24; exhibit 6.
[66] Id., p. 28; exhibit 8.
[67] Id., p. 20.
[68] McCarthy dep., p. 34; exhibit 12.
[69] Id., p. 23.

Portugal that is named simply, PAPE.[70] While these certifications (there are 106 of them) are not evidence that wine bearing the labels have been sold in the United States, they are evidence that many wine sellers have sought, and received, permission from the TTB for use of PAPE on labels in the past few years (the majority of labels date from 2009-2010), and we consider them for whatever probative value they may have.

Applicant has also submitted copies of two third-party registrations, based on use, for marks containing the term "papes" for wines other than those from Chateauneuf-du-Pape. These are: Reg. No. 1903762 for the mark CAVES DES PAPES for "wines";[71] and Reg. No. 2213047 for the mark HERITAGE DES CAVES DES PAPES for "wines."[72] The specimens submitted with these registrations, which are in the record, display the mark CAVES DES PAPES on a red wine from the region known as Crozes-Hermitage (an AOC), and the mark HERITAGE DES CAVES DES PAPES on a red wine from the Cotes du Rhone AOC. While third-party registrations, by themselves, are also not evidence of use, they are not irrelevant. Taken in conjunction with the evidence of actual use of the term "pape" in connection with wines and the evidence of a strong association between the papacy and the growing of grapes for wine in the Rhone Valley, established during the 14th century when the Pope took up residency in Avignon,[73] they suggest that the term "pape" has historical or other significance in connection with wine. *See,*

---

[70] Id., p. 34; exhibit 11.
[71] Registered July 4, 1995; renewed.
[72] Registered December 22, 1998; renewed.
[73] See, e.g., Junguenet dep., p. 21.

*e.g., Old Tyme Foods,* 22 USPQ2d at 1545 (evidence of third-party registrations coupled with evidence of prior use "could reasonably support an inference that [the applicant's] mark is weak"); 2 McCarthy on Trademarks and Unfair Competition § 11:90 (4th ed.) and cases cited therein.

Thus, even according opposer whatever limited rights to the term "Chateauneuf-du-Pape" are due as a result of its inclusion in opposer's registered mark, it can be seen that "pape" itself is a weak element, present in numerous third-party marks. Contrary to opposer's contention that these other "pape" wines are all Chateauneuf-du-Pape wine, they come from both within and outside the United States and one of the most famous, Chateau Pape Clement, has been in existence since the 13th century and identifies a wine from Bordeaux, an entirely different and unique appellation. This *du Pont* factor focusing on the use by other parties of the term common to applicant's and opposer's registered marks strongly favors applicant.[74]

4. *Actual Confusion*

Opposer argues that confusion is likely because there has been an instance of actual confusion. While a showing of actual confusion may be highly probative, on this record, we find opposer's minimal evidence of actual confusion to be less than probative. In a web posting about applicant's wine, a single user writes that he was disappointed by the wine, and that: "I was fooled by the name Des Papes." The reference does not unambiguously point to opposer, however. It may be that this

---

[74] Although we have not discussed in detail the registrations or other labels that have been presented by both parties with respect to the Chateauneuf-du-Pape designation, we have carefully considered and weighed the probative value of each reference.

user expected the wine to be from the region of Chateauneuf-du-Pape and to be of higher quality, but the user's comment does not prove that he expected a wine from opposer's syndicate and received applicant's wine in its place. In any event, this single instance of actual confusion is insufficient to show that confusion is likely. We consider this *du Pont* factor to be neutral.

5. *Additional du Pont Factors*

We recognize that the goods, as identified in the application and registration, are legally identical and that the trade channels and classes of consumers are considered to be the same. *See, e.g.*, *Bose Corp.*, 63 USPQ2d at 1310-11; *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1268, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) ("Absent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers.") These factors favor opposer. We do not hold the class of consumers, which includes the average American wine consumer, to be sophisticated despite the fact that the market for Chateauneuf-du-Pape wines appears to be the higher-end wine market. Wine is offered and sold to the general public, and there is no indication that customers for opposer's wines (or applicant's) are particularly sophisticated or that special education or study is necessary to purchase it. While it appears that opposer's wines may be somewhat more expensive than other wines, the parties have not pointed to any facts which would indicate that its purchase is accompanied by such an unusual level of care and scrutiny — or by such haste and

indifference — as would either mitigate or enhance any possibility of confusion. We thus consider this factor to be neutral.

Finally, although the parties have argued at length over applicant's use of papal symbols, the color red, Gothic-style lettering and the like, these considerations are not particularly germane to our determination under Section 2(d). The Board is constrained to consider the marks as they appear in the application and registration and not as they may be used or promoted in the marketplace. While applicant's standard character mark could be displayed in the same font style, size or color as opposer's mark, *see Citigroup Inc. v. Capital City Bank Group, Inc.,* 637 F.3d 1344, 1353, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011), this does not mean that we may infer that applicant's mark will be used with a design of the papal tiara or St. Peter's keys similar to opposer's registered design.

6. *Conclusion*

As noted at the outset, applicant admits to its lack of a bona fide intention to use the applied-for mark on "distilled spirits" or "liquors." Therefore, applicant is not entitled to register its mark for these goods.

With respect to likelihood of confusion, we find that the evidence does not support opposer's claim to common law rights in the term "Chateauneuf-du-Pape" by itself. Accordingly, this claim does not provide a basis for sustaining the opposition. As for whether a likelihood of confusion exists between opposer's registered mark CHATEAUNEUF-DU-PAPE CONTRÔLÉ and design and applicant's mark CHEMIN DES PAPES, we find the marks to be so dissimilar

31

overall that despite the similarities in the goods, trade channels, and classes of consumers, that confusion is not likely. *Cf., Kellogg Co. v. Pack 'em Enters., Inc.,* 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) (Affirming Board's holding that the dissimilarity of the marks—FROOTEE ICE and FROOT LOOPS—was dispositive); *Keebler Co. v. Murray Bakery Prods. Inc.,* 866 F.2d 1386, 9 USPQ2d 1736 (Fed. Cir. 1989). When viewed in their entireties, giving due weight to the components of each mark, and taking into account the weakness of the term "Chateauneuf-du-Pape Contrôlé," and the weakness of "pape" due to other uses, the presence of the term "pape" as the only common element in both parties' marks is an insufficient basis for finding applicant's mark to create a likelihood of confusion. We find instead that confusion is not likely. Indeed, the first *du Pont* factor outweighs all of the other factors.

**Decision**: The opposition is granted with respect to "distilled spirits and liquors" and dismissed with respect to "wines, sparkling wines." *See The Wet Seal, Inc. v. FD Management, Inc.,* 82 USPQ2d 1629, 1633 (TTAB 2007) ("an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them."). In accordance with the evidence of record, and following close of the appeal period, the identification of goods in applicant's application will be amended to reflect those goods with which it has a bona fide intent to use the mark, namely, "wines, sparkling wines," and a Notice of Allowance will issue in due course.